**Donna S. SHEEHAN, Appellant,**

v.

**NORTHWESTERN MUTUAL LIFE INSURANCE CO and The John M. Qualy Agency, Respondent.**

**No. ED 77305.**

Missouri Court of Appeals, Eastern District, Division Three.

Nov. 14, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 9, 2001.

Case Transferred to Supreme Court Feb. 13, 2001.

Case Retransferred to Court of Appeals May 29, 2001.

Original Opinion Reinstated June 11, 2001.

Michael D. O'Keefe, St. Louis, MO, for Appellant.

Thomas B. Weaver, Karen A. Baudendistel, St. Louis, for Respondent NW Mutual Life Ins.

Dawn Johnson, David M. Harris, St. Louis, MO, for Respondent John M. Qualy Agency.

GEORGE W. DRAPER III, Judge.

Donna Sheehan (hereinafter, "Appellant") appeals from the trial court's grant of two summary judgment motions in favor of defendants John M. Qualy Agency (hereinafter, "Qualy") and Northwestern Mutual Life Insurance Company (hereinafter, "Northwestern") claiming: (1) there are genuine issues of material fact as to the fiduciary duties owed to her by Qualy as her insurance agent; (2) the trial court erred in denying leave to amend her petition; (3) the trial court erred in applying Michigan law to her claims against Northwestern; and (4) there are genuine issues of material fact as to her claims and Northwestern's affirmative defense. The judgments of the trial court are affirmed in part, reversed and remanded in part.

Appellant is the beneficiary of a life insurance policy issued by Northwestern in December 1996, on the life of Thomas Sheehan, Appellant's husband (hereinafter, "Decedent"). Decedent engaged Christopher Wright (hereinafter "Wright") as his insurance agent to procure the policy. Wright was an agent working for Qualy and was the Sheehans' family friend. Wright previously purchased various insurance policies for the Sheehans.

Decedent approached Wright about purchasing more life insurance after learning Appellant was pregnant. Wright advised, in a letter dated August 27, 1996, that he was enclosing application signature pages for Decedent to sign and he would work out the details regarding submission of the forms. There is a dispute as to whether Decedent received the entire application or only the signature pages, and whether Decedent signed those pages in blank. Robin Hensley, an associate of Wright's, testified that she filled out all of the information on the first five pages of the application, such as name, address, and other similar information.

After the application was completed, Decedent was scheduled for a paramedical examination. There is also a dispute as to whether Decedent actually participated in the paramedical examination or if the paramedical questionnaire was filled out after Decedent signed the form in blank. Michele Chiaramonte (hereinafter "Chiaramonte"), a licensed practical nurse who conducts paramedical examinations for various insurance companies, including Northwestern, submitted an affidavit stating she had no specific recollection of Decedent's exam. However, she further stated it is her custom and practice during every paramedical examination to ask the applicant each question as it is printed on the questionnaire. The applicant responds, and she records the answers after each question by marking a box either "yes" or "no" consistent with the applicant's answer. If an applicant answers "yes" to a question, Chiaramonte records details about that answer in the space provided based upon the information received from the applicant. After the questionnaire is completed, Chiaramonte gives it to the applicant to review and sign.

The paramedical questionnaire was signed by Decedent and dated December 7, 1996, and the answers represented Decedent was not taking any medication or drugs (legal or illegal, prescription or nonprescription) for any reason. Further, the answers represented Decedent had not used any tranquilizers, sedatives or narcotic drugs in the last ten years, and he had not been advised to have any test, consultation, hospitalization, or surgery that was not completed in the last five years. However, Decedent did reveal he had used "muscle relaxors" in 1995, had been treat-

ed by Dr. Edelman, and had a single incident of cocaine use at a bachelor party in 1995.

After submission of all of the insurance materials, Northwestern's underwriters evaluated Decedent's application. Due to Decedent's age and amount of coverage requested, Decedent needed to submit to a full medical examination. The underwriters concluded that regardless of the results of the medical examination, Decedent would not be insured by Northwestern based on the prior positive drug test and his elevated liver enzymes. Therefore, after initially declining coverage, Northwestern submitted Decedent's application for reinsurance with several companies, including Business Men's Assurance Company (hereinafter "BMA"). In February 1997, BMA advised Northwestern it would reinsure a life insurance policy on Decedent. Thereafter, Northwestern issued a life insurance policy to Decedent and delivered it to him in March 1997, with an effective date of December 6, 1996. Enclosed with the policy was a personal health and status declaration, identified as a supplement to the application, that was signed by Decedent stating since the date of the original application, he had not used illegal drugs or legally prescribed drugs except as stated in the original application.

Decedent died on April 17, 1997, from acute morphine intoxication as stated on his death certificate. Northwestern submitted a claim packet to Wright, who in turn forwarded the packet to Appellant with a letter explaining the claim packet had to be completed in order to obtain payment of the policy benefits. In addition to providing proof of death, Appellant provided a signed authorization that enabled Northwestern to obtain Decedent's medical records for the purpose of evaluating the insurance claim. Northwestern used this authorization to obtain records from several of Decedent's treating physicians to process the claim.

The medical records revealed Decedent had a history of drug use that was not disclosed on the paramedical questionnaire. According to medical records and testimony of three of Decedent's physicians, Decedent had been prescribed and was taking vicodin, valium, percodan, and other prescription drugs for several months before completing the paramedical questionnaire in December 1996. These records also revealed Decedent took these drugs in excess of their prescribed dosages. Moreover, Decedent continued to take these prescription drugs after signing the paramedical questionnaire and after signing the personal health and status declaration form in March 1997. After reviewing the medical records, Northwestern notified Appellant on October 30, 1997, that in light of the misrepresentation in Decedent's application as to his prior drug use, it rescinded the life insurance policy.

On November 20, 1997, Appellant filed suit against Qualy and Northwestern. Appellant alleged Qualy was negligent in helping Appellant process her claim for benefits and alleged an action for breach of contract. Appellant alleged any misrepresentations that were contained in the application were Qualy's. On August 24, 1999, Appellant requested leave to amend her petition to add a claim of breach of fiduciary duty against Qualy. The trial judge denied her motion to amend. Moreover, Appellant alleged Northwestern breached the life insurance contract and vexatiously refused to pay the benefits. Northwestern asserted two affirmative defenses, material misrepresentation and fraudulent misrepresentation. The material misrepresentation affirmative defense was struck as a discovery sanction.

On November 5, 1998, Qualy moved for summary judgment, which was granted by

the trial court on October 20, 1999. On November 24, 1999, the circuit court also granted Northwestern's summary judgment motion based upon the misrepresentations made in Decedent's application. This appeal followed.

Appellant's first point on appeal claims the trial court erred in granting Qualy's motion for summary judgment and in denying leave to amend her petition to include claims for breach of fiduciary duty and breach of contract. Appellant claims that since leave to amend is freely given, the trial court abused its discretion in not granting her leave. We consider the trial court's denial of Appellant's motion to amend first.

■■■ Whether a party will be allowed to amend its pleadings is primarily a matter within the sound discretion of the trial court and is reviewed only for an abuse of discretion. *Rhodes v. Westoak Realty & Inv., Inc.*, 983 S.W.2d 565, 568 (Mo.App. E.D.1998). Rule 55.33 provides leave to amend a petition "shall be freely given when justice requires." Although the rule stresses liberality in allowing amendments to pleadings, granting leave is not mandatory. *Chapman v. St. Louis County Bank*, 649 S.W.2d 920, 923 (Mo.App. E.D. 1983). Factors that should be considered in deciding whether to allow leave to amend a petition are: (1) hardship to the moving party if leave is not granted; (2) reasons for failure to include any new matter in earlier pleadings; (3) timeliness of the application; (4) whether an amendment could cure any inadequacy of the moving party's pleading; and (5) injustice resulting to the party opposing the motion, should it be granted. *Manzer v. Sanchez*, 985 S.W.2d 936, 939 (Mo.App. E.D.1999).

■■■ In this case, Appellant offers no explanation why her amended claims were not included in the earlier pleadings or were not made at an earlier time. Appellant filed a motion to amend her pleadings almost two years after this lawsuit was filed and after Qualy submitted its motion for summary judgment. The trial court's order granting summary judgment in favor of Qualy indicated it considered Appellant's claims in her amended petition and decided that granting the amendment would have no bearing on its decision. Therefore, we find there was no abuse of discretion in not granting Appellant leave to amend her petition against Qualy.

■■■ In addressing Appellant's allegation that the trial court erred in granting summary judgment in favor of Qualy, it is well settled that when considering an appeal from summary judgment, we review the record in the light most favorable to the nonmovant. *ITT Commercial Fin. v. Mid–America Marine*, 854 S.W.2d 371, 376 (Mo. banc 1993). Our review is essentially *de novo*. *Id.* at 376. The criteria on appeal for testing the propriety of summary judgment are no different from those employed by the trial court to determine the propriety of sustaining the motion initially. *Id.* The burden of proof on a summary judgment movant is to establish a legal right to judgment flowing from facts about which there is no genuine dispute. *Id.* at 378.

■■ A "defending" party may establish a right to judgment by showing: (1) facts that negate any one of the claimant's elements; (2) that the nonmovant has not been able to produce, or will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any of the claimant's elements; or (3) that there is no genuine dispute as to the existence of facts necessary to support the movant's properly pleaded affirmative defense. *Id.* at 381.

The nonmovant must show by affidavits, depositions, answers to interrogatories, or

admissions on file, that one or more of the material facts shown by the movant to be without any genuine dispute is, in fact, genuinely disputed. *Id.* A "genuine issue" exists where the record contains competent materials that establish a plausible, but contradictory, version of the movant's essential facts. *Id.* at 382.

Appellant argues the trial court denied her due process in that it rested its decision to grant summary judgment on an allegation not raised in Qualy's motion. She points to a portion of the trial court's order, which reads:

> Nothing in the record supports a finding that Plaintiff's decedent in fact could have obtained other life insurance at the time of his original application, or that Northwestern would have paid the policy claim without the authorization requested by Qualy from Plaintiff.

Appellant alleges that neither Qualy's motion nor her response addressed whether Decedent's life was insurable in 1996, or whether Northwestern would have rescinded the policy had Qualy not procured the medical authorization from her. Qualy argues that the trial court is allowed to look at all of the information on file to determine whether a genuine issue of material fact exists, and in doing so, did not violate Appellant's due process rights.

■■■■ On appeal from a grant of summary judgment, this court's review is limited to documents set out with specificity in the motion for summary judgment and response thereto, and does not extend to a review of the entire record. *Mothershead v. Greenbriar Country Club, Inc.*, 994 S.W.2d 80, 85 (Mo.App. E.D.1999). Therefore, Qualy is incorrect in stating the trial judge could base his decision on any item filed in the lawsuit that was not specifically set out in the motion for summary judgment. However, summary judgment may be affirmed if sustainable under any theory. *Jos. A. Bank Clothiers, Inc. v. Brodsky,* 950 S.W.2d 297, 300 (Mo.App. E.D. 1997).

■■■■ The trial court's order granting summary judgment in favor of Qualy addressed several other issues besides the one Appellant cites. First, the trial court held that Qualy had no duty to notify Decedent that his insurance policy had been transferred to a reinsurer in that this requirement only applies to insurers, not agents. Second, the trial court held that even if Qualy owed Appellant a fiduciary duty, any alleged breach of that duty was not the proximate cause of her injuries because ultimately the cause of Appellant's claim being denied was Decedent's misrepresentations on the questionnaire. Third, the trial court determined that Qualy was not negligent in attempting to find other insurance for Decedent in that there were no damages flowing from this alleged breach of duty. The trial court explained that even assuming Qualy completed the application without obtaining any information from Decedent, the record did not contain facts that had Qualy been provided a truthful and complete application, Decedent would have received more or different insurance. Finally, the trial court discussed Appellant's claim that Qualy breached its fiduciary duty by obtaining the medical authorization from her when processing her claim, which ultimately allowed Northwestern to deny her claim for benefits. The trial court held that even if there were a breach, there was no indication that had Appellant not provided Northwestern with the authorization it requested Northwestern would have still paid out the benefits notwithstanding the cause of death listed on the death certificate. Moreover, the trial court pointed to the fact that Decedent's initial application contained a medical authorization which

was effective for thirty months after the policy was issued. This would have provided Northwestern the ability to obtain Decedent's medical records in the absence of Appellant signing an additional authorization. Based on the foregoing reasons the trial court concluded that there were no genuine issues of material fact and that Qualy was entitled to judgment as a matter of law. We agree. Point denied.

Appellant's second point argues that the trial court erred in granting summary judgment to Northwestern to the extent that the decision was based on the application of Michigan law. Appellant argues that the trial court erroneously viewed the facts that it believed to be germane to resolving the choice of law question and it erroneously applied the controlling rule of law to the summary judgment motion.

Appellant relies on *O'Maley v. Northwestern Mutual Life Ins. Co.*, 231 Mo.App. 39, 95 S.W.2d 852, 857 (1936) as controlling authority to determine which law applies. Appellant argues that in the case of life insurance policies, Missouri adheres to the principle of *lex loci contractus*. Essentially, Appellant argues that *O'Maley* applies in that an insurance policy issued on an application executed in Missouri, with a provision for delivery in Missouri, when delivered to Missouri is to be considered a Missouri contract.

■■■ Appellant points to several facts alleging that they are controlling in determining which law to apply. First, Appellant argues that Wright completed the application in Missouri, on a form clearly intended by Northwestern to be used to apply for a Missouri policy. Second, the policy itself is issued on a form intended to be a Missouri policy. Third, when Northwestern issued the policy, it notified Decedent at his home address in Michigan, stating the policy would be sent to his agent in Missouri. Fourth, Wright accept-

ed the policy in Missouri. Finally, Northwestern sent the notice of rescission to Missouri where Appellant and her attorney were located.

■■■ Missouri courts apply the "most significant relationship" test as set forth in Restatement (Second) of Conflict of Laws Section 188 when resolving choice of law issues. *Emerson Elec. Co. v. Crawford & Co.*, 963 S.W.2d 268, 273–74 (Mo. App. E.D.1997). In the instant case, the parties did not make an effective choice of law, so we look to Section 188(2) to identify five potentially significant contacts to weigh in our determination of which state has the most significant relationship. *Id.* This requires a balancing of: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement (Second) of Conflicts of Laws Section 188. *Superior Equip. Co., Inc. v. Maryland Cas. Co.*, 986 S.W.2d 477, 480 (Mo.App. E.D.1998).

■■■ In this case, the record shows that at the time the policy was applied for Decedent was domiciled in Michigan. The validity of a life insurance contract issued to the insured upon his application and the rights created thereby are determined by the local law of the state where the insured was domiciled at the time the policy was applied for, unless, with respect to the particular issue, some other state has a more significant relationship. Restatement (Second) of Conflict of Laws Section 192. The law of the insured's domicile generally controls issues arising under a life insurance policy because a state has a strong interest in protecting its own citizens. *Buck v. Am. States Life Ins. Co.*, 723 F.Supp. 155, 159 (E.D.Mo.1989).

■ Further, Decedent was the insured risk under the contract. In an action between the parties to an insurance contract, the principal location of the insured risk is given greater weight than any other single contact in determining the state of applicable law provided that the risk can be located in a particular state. Restatement (Second) of Conflict of Laws Section 193; *Atlas Intermodal Trucking Serv., Inc. v. United Fire & Cas. Co.*, 973 S.W.2d 174, 178 (Mo.App. E.D.1998). The trial court correctly determined that Michigan law applied to this case. Point denied.

Appellant's remaining points allege that the trial court erred in granting summary judgment because there are several genuine issues of material fact which show Northwestern has not met its burden of proving it is entitled to judgment as a matter of law based on its affirmative defense of fraudulent misrepresentation.

Under Michigan law, to prove fraudulent misrepresentation, the defendant must show: (1) the plaintiff made a material representation; (2) the representation was false; (3) when making the representation, the plaintiff knew or should have known it was false; (4) the plaintiff made the representation with the intention that the defendant would act upon it; and (5) the defendant acted upon it and suffered damages as a result. *Novak v. Nationwide Mut. Ins. Co.*, 235 Mich.App. 675, 599 N.W.2d 546, 553 (1999).

■ Appellant's sixth point claims that there is a genuine factual dispute as to whether Decedent knew his statements were false because he disclosed his cocaine use to his insurance agent, his treatment by Dr. Edelman, and disclosed his pre-

scription for muscle relaxors. Appellant argues that when these disclosures are contrasted with the questions Northwestern contends are answered falsely on the paramedical questionnaire, it is evident that Decedent misunderstood the import of the questions. The dissent would ascribe to Decedent, without factual support in the record, the knowledge of a pharmacist. Indeed, Decedent's demise was arguably caused by his inability to distinguish a controlled substance from an over-the-counter headache medication. The last drug prescription provided to Decedent before he signed the paramedical form occurred on October 31, 1996. Therefore, his response on December 10, 1996, regarding question 32 [1] may have been honest and correct. As to question 34, although Northwestern is aware that the prescribed drugs constitute, and are properly referred to as tranquilizers, sedatives, or narcotics, nothing in the record indicates that Decedent referred to his prescription medication as anything but their proper prescription names or generally as "muscle relaxors."

There is no evidence to establish that Decedent was able to distinguish between the classifications of the medications as "muscle relaxors" as opposed to those classified as "tranquilizers," "sedatives," or "narcotics". We find that this is a genuine issue of material fact. The record before the court contains competent materials that establish a plausible, but contradictory, version of the movant's essential facts. *ITT Commercial Finance*, 854 S.W.2d at 382. Since we find a genuine issue of material fact as to this point, we decline to address Appellant's other points on appeal.

---

1. Question 32 of the paramedical questionnaire asked: Are you taking medication or drugs (legal or illegal, prescription or nonpre- scription) for any reason? If yes, list and explain. Decedent responded no.

The judgments are affirmed as to Qualy and reversed and remanded as to Northwestern.

GARY M. GAERTNER, Sr., P.J., concurs.

L. CRAHAN, J., dissents.

LAWRENCE G. CRAHAN, Judge, dissenting.

I respectfully dissent. I concur fully in the disposition of Appellant's first five points. I cannot agree that the record before us establishes a genuine issue of material fact as to whether Decedent knew his statements on the paramedical questionnaire portion of the application for life insurance were false.

Appellant offered no evidence to controvert the following facts, which must therefore be accepted as true. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). In 1995, Decedent's application for disability insurance was rejected by Northwestern Mutual Life Insurance Company ("Northwestern") when it learned that he had tested positive for cocaine use in connection with an application for insurance through another company in 1994. At that time, Decedent disputed the test result and denied he had ever used cocaine.

In 1996, Decedent began discussing the possibility of acquiring additional life insurance with Christopher Wright, a family friend and an insurance agent under contract with the John M. Qualy Agency ("Qualy"). Decedent subsequently signed an application form for life insurance with defendant Northwestern dated December 10, 1996. There is no dispute that Decedent's signature appears on the application form.

On December 7, 1996, Decedent appeared for a paramedical examination in Grand Rapids, Michigan, conducted by Michele Chiaramonte. During the examination, Decedent answered questions in a paramedical questionnaire relating to his health and medical treatment history. After answering the questions, he signed the paramedical questionnaire, declaring that "my answers and statements are correctly recorded, complete and true to the best of my knowledge and belief." There is no dispute that Decedent's signature is on the paramedical questionnaire.

The application form included questions numbered 1–30 and the paramedical questionnaire included questions numbered 31–42. The application form and the paramedical questionnaire combined to form the complete application ("the Application") that was submitted to Northwestern for consideration.

In response to a question on the application form about whether he had ever been denied insurance, Decedent admitted that he had been previously denied insurance by Northwestern based on a blood test that was positive for cocaine. In explanation, Decedent submitted a letter to Mr. Wright stating that he had attended a bachelor party where he was "exposed to some highly undesirable contraband." According to Decedent, this one situation was the reason for the test result and he no longer associated with the others involved. In response to a question about whether he had seen any physician or received any treatment within the preceding five years, Decedent admitted having seen Dr. John Edelman for back problems and having been prescribed "muscle relaxors" in 1995. In several other responses, however, Decedent failed to disclose his more recent history of drug use.

Question 32 of the paramedical questionnaire asked:

Are you taking medication or drugs (legal or illegal, prescription or nonprescription) for any reason? If yes, list and explain.

_____ YES _____ NO

In response to Question 32, Decedent responded "no."

Question 34.c. of the paramedical questionnaire asked:

In the last 10 years have you used any tranquilizers, sedatives or narcotic drugs?

_____ YES _____ NO

In response to Question 34.c., Decedent responded "no."

Question 34.d. of the paramedical questionnaire asked:

In the last 10 years, have you used legally prescribed drugs in excess of dosages prescribed by a physician or medical practitioner?

_____ YES _____ NO

In response to Question 34.d., Decedent responded "no."

Decedent's responses to Questions 32, 34c and 34d were false.

Dr. Robert DeJonge is a physician in private practice in Michigan. Decedent was a patient of Dr. DeJonge. According to the testimony and medical records of Dr. DeJonge, prior to December 10, 1996, the date of the paramedical questionnaire, Decedent was prescribed and using the following tranquilizers and narcotics:

| | |
|---|---|
| April 3, 1996: | Vicodin ES (20 tablets), Valium 10 mg (5 tablets) |
| April 4, 1996: | Valium 10 mg (15 tablets) |
| April 15, 1996: | Vicodin ES (20 tablets), Valium 10 mg (5 tablets) |
| June 6, 1996: | Valium 10 mg (12 tablets) |
| July 8, 1996: | Valium 10 mg (1 tablet) |
| July 15, 1996: | Valium 10 mg (15 tablets) |
| July 30, 1996: | Vicodin ES (12 tablets), Valium 10 mg (30 tablets) |
| Sept. 20, 1996: | Vicodin ES (12 tablets), Valium 10 mg (30 tablets) |
| Oct. 8, 1996: | Valium 10 mg (30 tablets) |

Dr. John Edelman is also a physician in private practice in Michigan who treated Decedent. According to Dr. Edelman's testimony and medical records, in the two months prior to completing the Application, Decedent was prescribed and using the following tranquilizers and narcotics:

| | |
|---|---|
| October 9, 1996: | Vicodin ES (40 tablets), Valium 10 mg (50 tablets) |
| October 17, 1996: | Percodan (15 tablets) |
| October 31, 1996: | Vicodin (12 tablets) |

In addition to the medical records and testimony of Dr. DeJonge and Dr. Edelman, pharmacy records establish that, in the nine months prior to December 10, 1996, Decedent also obtained prescriptions for the following drugs:

| | |
|---|---|
| March 24, 1996: | Valium 10 mg (20 tablets) |
| March 28, 1996: | Loranzepan 2 mg (10 tablets), Ultram 50 mg (20 tablets) |
| April 11, 1996: | Hydrocodone (5 tablets), Ultram 50 mg (30 tablets) |
| October 30, 1996: | Valium 10 mg (50 tablets) |

Vicodin ES and Percodan are narcotics. Valium is a tranquilizer.

On October 17, 1996, when he prescribed Percodan for Decedent, Dr. Edelman advised Decedent that only one tablet of the drug should be taken every six to eight hours. Despite this direction, in a letter dated October 18, 1996, Decedent admitted that he was taking more than three tablets of Percodan. In that same letter to Dr. Edelman, Decedent evaluated the efficacy of the various drugs he was taking.

The medical records also show that on or about November 1, 1996, Decedent took an empty Vicodin prescription bottle to a pharmacy and attempted to persuade the pharmacist to refill it with Vicodin ES, without a prescription. Decedent also contacted a pharmacy to ask whether using Tagamet would keep valium and Vicodin in his system longer.

Decedent admitted to Dr. DeJonge that he had once taken 50 valium at one time. Dr. DeJonge felt that Decedent had used large doses of narcotics inappropriately during his care of him. On October 29, 1996, Dr. Edelman recommended to Decedent that he go to a substance abuse clinic

because of concern over his extensive use of prescription drugs.

In response to defendant Northwestern's motion for summary judgment, Appellant did not dispute any of the above evidence regarding the nature and quantity of drugs prescribed for and used by Decedent in the nine months prior to completing the Application. In her sixth point of error, however, Appellant claims that the foregoing evidence was insufficient to establish no genuine dispute that Decedent knew his answers to questions 32, 34c. and 34d. were false. Appellant notes that he did disclose that he had been seen at Blodgett Medical Center for a sore back in 1995 and had been prescribed "muscle relaxors." She claims, however, that the evidence does not establish that Decedent was conversant with the classification of particular medications as "tranquilizers," "sedatives" or "narcotics." Thus, Appellant urges, there is a genuine issue of material fact as to whether Decedent was familiar with these technical terms as employed in the questionnaire.

Although there was ample evidence that Decedent was extremely knowledgeable and sophisticated about the types of drugs he was using (including requests for particular types of narcotics), Appellant's argument is ultimately a red herring. Nothing in Question 32 required Decedent to distinguish between the classification of various drugs. Question 32 asked whether Decedent was taking medicine or drugs, legal or illegal, prescription or nonprescription for any reason. It did not matter whether the drugs were tranquilizers, sedatives or narcotics. Decedent answered "no." Coupled with his disclosure that he had been prescribed "muscle relaxors" in 1995, this amounted to an affirmative representation that he was no longer taking any medication of any kind. Moreover, the extensive variety of medications Decedent was taking at the time he responded to the questionnaire were not muscle relaxors prescribed by anyone at Blodgett Medical Center. They were tranquilizers and narcotics prescribed by Dr. Edelman in response to Decedent's complaints of neck pain.[1]

Likewise, question 34.d. did not require Decedent to be familiar with whether drugs were "tranquilizers," "sedatives" or "narcotics." Question 34.d. asked, "In the past 10 years, have you used legally prescribed drugs in excess of dosages, prescribed by a physician or medical practitioner." Appellant does not even argue that there is a genuine issue as to whether Decedent gave a false answer to this question, nor will the record support such an argument. Dr. Edelman testified that when he finally agreed to prescribe Percodan for Decedent, he expressly instructed Decedent not to take more than one tablet at a time every six to eight hours. The very next day Decedent informed Dr. Edelman that he had taken three tablets at once. Decedent also admitted to Dr. DeJonge that he had taken 50 valium tablets at once, an amount that no one could reasonably believe was a prescribed amount. Thus, Decedent had to know that his answer to Question 34.d. was false.

Appellant's remaining contentions, not reached by the majority, are equally without merit but need not be discussed herein. I would affirm the judgment.

**1.** Indeed, elsewhere on the form, Decedent did disclose that he suffered a herniated disc confirmed by an MRI ordered by Dr. Edelman. That disclosure, however, indicates only "exercises given" and makes no mention of Dr. Edelman prescribing any drugs.